IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANGELA LUMPKIN,

        Plaintiff,

   vs.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

)
)
)
)
)
)
)
)
)
)

CASE NO. 1:21-CV-481


MAGISTRATE JUDGE
JONATHAN D. GREENBERG


**MEMORANDUM OF OPINION AND
ORDER**

     Plaintiff, Angela Lumpkin ("Plaintiff" or "Lumpkin"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

     On December 3, 2019, Lumpkin filed an application for SSI, alleging a disability onset date of July 1, 2010 and claiming she was disabled due to lupus, skin problems, and fibromyalgia.  Transcript ("Tr.") at 169, 199.  The application was denied initially and upon reconsideration, and Lumpkin requested a hearing before an administrative law judge ("ALJ").  Tr. 129.

     On September 11, 2020, an ALJ held a hearing, during which Lumpkin, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 47-74.  On September 28, 2020, the ALJ issued a

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

written decision finding that Lumpkin was not disabled.  Tr. 27-42.  The ALJ's decision became final on

January 6, 2021, when the Appeals Council declined further review.  Tr. 1-4.

On March 1, 2021, Lumpkin filed her Complaint to challenge the Commissioner's final decision.

Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 13, 15.  Lumpkin asserts the

following assignment of error:

> Whether the Administrative Law Judge's decision that Plaintiff can perform light work is
> supported by substantial evidence when he failed to consider Plaintiff's psychological and
> fibromyalgia impairments severe.

Doc. No. 13, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Lumpkin was born in 1978 and was 41 years old on the date the application was filed.  Tr. 40.  She

has at least a high school education and no past relevant work.  Tr. 40.

### B.    Relevant Medical Evidence[2]

On June 17, 2015, Lumpkin was admitted to Mercy Regional Medical Center for severe anxiety,

poor appetite, and not taking her medications.  Tr. 287.  She was treated, improved, and discharged on

June 22 with medication prescriptions including Seroquel, Cymbalta, and Vistaril.  Tr. 287-288.

On October 16, 2017, Lumpkin saw Dr. Mazen Dahbar at the Cleveland Clinic to establish care.

Tr. 334.  She had a secondary concern for insomnia caused by anxiety and depression and was interested

in seeing a psychiatrist to help manage that problem.  Tr. 334.  She reported having been diagnosed with

systemic lupus erythematosus (SLE) eight years prior; she sees a rheumatologist and her condition is

managed on hydroxychloroquine.  Tr. 334.  She had had chronic pain since her SLE diagnosis and took

Naproxen for pain.  Tr. 334.  She took Flexeril to help her sleep but most days woke up around 3am; she

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited
in the parties' Briefs.

had tried melatonin but it had not helped.  Tr. 334.  Her physical exam findings were normal, and she had a normal affect and her mood appeared anxious.  Tr. 336.  Dr. Dahbar diagnosed SLE, generalized anxiety disorder, and moderate episode of recurrent major depression; increased her melatonin; and provided her with a psychiatry consultation.  Tr. 337.

On January 17, 2018, Lumpkin saw Dr. Dahbar for a follow-up and reported that her sleep had improved since increasing her melatonin and that, overall, she was better since her last visit.  Tr. 344.  She denied suicidal ideation and was not interested in medication.  Tr. 344.  Regarding her psychiatry referral, she reported that she went a few times but didn't see how it was going to help her, so she stopped going.  Tr. 344.  She was taking a new pain medication her rheumatologist had given her.  Tr. 344.  Her physical and psychiatric exam findings were normal.  Tr. 345.  Dr. Dahbar did not add any new medications or treatment and Lumpkin was to follow up in six months or sooner, if needed.  Tr. 345.

On July 18, 2018, Lumpkin followed up with Dr. Dahbar.  Tr. 349.  She stated that she continued to feel tired sometimes during the day and reported a history of hyperlipidemia and low vitamin D.  Tr. 349.  Her exam findings were normal.  Tr. 350-351.  Dr. Dahbar assessed chronic fatigue, hyperlipidemia, and a vitamin D deficiency and ordered lab work.  Tr. 351.

On February 6, 2019, Lumpkin saw rheumatologist Shailey Desai, M.D., for an opinion and advice regarding an evaluation for lupus.  Tr. 260-261.  Lumpkin reported her history: she had had photosensitivity since childhood, developed right leg pain around 2009, and developed pain in her wrists and hand joints and a painful purple rash over her left arm in 2012.  Tr. 261.  A skin biopsy was consistent with lupus and she was started on hydroxychloroquine, but her rash grew and spread to other areas.  Tr. 261.  From 2012-2015 she had tried Prednisone (which did not help the rash), Neurontin for leg pain (but stopped it because it did not help), and she reported that Cymbalta and Paxil were

3

ineffective.  Tr. 261.  She endorsed joint swelling, arthralgia, morning stiffness, neck and back pain, photosensitivity and change in vision.  Tr. 262.  Upon exam, she was awake, alert, and oriented; she had a rash on her arm and alopecia on her scalp; a normal gait and full muscle strength in her upper and lower extremities; no synovitis, erythema or warmth in any joint; a full range of motion in all joints; and she was able to fully close her fists and curl her fingers.  Tr. 262-263.  Her widespread pain index (WPI) number was 12/19 and her symptoms severity score (SS) was 9/12, which were consistent with fibromyalgia.  Tr. 263.  Dr. Desai's impression was lupus and she continued her medication and added a prescription to help her rash.  Tr. 263.  She also assessed fibromyalgia based on her WPI and SS scores, recommended aerobic exercises, and prescribed Amitriptyline.  Tr. 263.  On February 8, Dr. Desai reviewed Lumpkin's lab results showing an abnormal ANA consistent with lupus.  Tr. 260.

On August 16, 2019, Lumpkin saw Dr. Desai for a follow up.  Tr. 254.  She had a persistent rash on her left arm but not elsewhere.  Tr. 253.  Her pain was unchanged, including her right sciatica pain.  Tr. 253.  The Amitriptyline helped with her sleep but she was unsure whether it helped with her pain.  Tr. 253.  Her exam findings were as her prior visit.  Tr. 254.  Dr. Desai's impression was lupus with a history of rash and joint pains which were more consistent with fibromyalgia.  Tr. 255.  Dr. Desai increased Lumpkin's hydroxychloroquine and added methotrexate for her lupus and continued her Amitriptyline for fibromyalgia.  Tr. 255-256.

On February 7, 2020, Lumpkin saw Ronald Smith, Ph.D., for a psychological consultative examination.  Tr. 297-303.  She reported that she applied for benefits because of lupus, fibromyalgia, depression, and anxiety.  Tr. 297.  She usually got along okay with others at work or just stayed by herself and she explained that she is an introvert and doesn't trust people.  Tr. 298.  At her past work she could deal okay with patients, coworkers and bosses because it was separate from her personal life.  Tr. 298.  She was taking Plaquenil, Flexeril, Methotrexate, Elavil, Naproxen, vitamins, and she used

4

prescription cream.  Tr. 299.  She reported her hospitalization in 2015 and explained that at that time she wasn't sleeping, she was in a lot of pain, and she was going through a lot of difficulties.  Tr. 299.  She did not continue taking the medication the hospital had prescribed her and she had had no follow-up outpatient treatment.  Tr. 299.

Dr. Smith commented that she jiggled her leg throughout the interview and she had very rapid speech, but her speech was direct and pointed and her thinking was well-organized.  Tr. 300.  She had an appropriate affect with good range, described her mood as generally okay, and agreed with Dr. Smith's suggestion that she was high strung.  Tr. 300.  She reported crying occasionally when she was alone and felt sad and she found it therapeutic once a month; she did not consider herself depressed, just sad.  Tr. 300.  For hobbies, she read and had a lot of plants.  Tr. 300.  She stated that she felt motivated to do as much as she can within her physical limitations and would do more if she could.  Tr. 300.  She felt like her physical condition was getting worse and thinking about interacting with people made her anxious; "I could do it but I don't like to."  Tr. 300.

Lumpkin was alert, in good contact with reality, and was well oriented to time and place.  Tr. 301.  She could count backwards from 20 to one in 15 seconds, say the alphabet in eight seconds, and count from one to 40 by threes in 15 seconds with no error.  Tr. 301.  She could remember five digits forward and six backward.  Tr. 301.  Her insight and judgment appeared to be "fairly good."  Tr. 301.  Dr. Smith diagnosed ADHD, predominately hyperactive impulsive presentation, mild.  Tr. 302.  He opined that Lumpkin appeared capable of understanding written or spoken job instructions but would occasionally have difficulty carrying them out over a long period of time.  Tr. 302.  He stated that she may have difficulty maintaining adequate attention and concentration and persistence in the performance of simple or more complex tasks in a long work day and work week, noting that she reported having had only part-time jobs.  Tr. 302.  She may have some difficulty dealing with groups of co-workers because

5

of her preference to avoid others but would probably be capable of dealing appropriately with a supportive supervisor, and she may have occasional difficulty dealing with interpersonal work pressures that may arise in a job situation.  Tr. 303.

On February 23, 2020, Lumpkin saw Dr. Ashley Fuentes for a physical consultative exam.  Tr. 305-307.  Her chief complaint was chronic pain due to lupus and fibromyalgia.  Tr. 305.  She had skin symptoms, constant pain all over that was worse at night, and she did not sleep well.  Tr. 305.  She reported that she had been diagnosed with depression/bipolar disorder but believed that most of her issues were due to lack of sleep from chronic pain.  Tr. 305.  Her exam findings were normal.  Tr. 306. Dr. Fuentes diagnosed cutaneous lupus, fibromyalgia, and mental health issues, and stated that, based on that day's exam, Lumpkin appeared to have no limitations with standing, walking lifting, carrying, handling, traveling, speaking, memory, sitting, or hearing.  Tr. 307.

On March 31, 2020, Lumpkin saw Dr. Desai for a follow up and reported diffuse joint pain.  Tr. 316.  She had stopped taking Methotrexate after 2 to 3 months due to hair loss and the inconvenience of getting lab work done, and her hair loss improved.  Tr. 316.  Upon exam, she was awake, alert, and oriented and she had no visible rash or discoloration or effusion of affected joints.  Tr. 317.  Dr. Desai continued her hydroxychloroquine for lupus, Amitriptyline and Flexeril for fibromyalgia, and advised that other medications could be considered for her lupus but Lumpkin wanted to defer other medications for now.  Tr. 318.

On June 9, 2020, Lumpkin had a tele-med visit with Dr. Dahbar and reported taking her medication regularly, feeling tired lately, and needing a refill on her vitamin D prescription.  Tr. 436.

On June 12, 2020, Lumpkin had a tele-med visit with registered nurse practitioner Deshawn Jones from Dr. Desai's office.  Tr. 440-441.  The appointment was an urgent visit scheduled due to Lumpkin's low back pain, right leg pain, and swelling that had worsened over the last month.  Tr. 441.

6

She rated her pain 9/10.  Tr. 441.  She had no joint swelling but reported stiffness.  Tr. 441.  She endorsed hair loss, fatigue and "photosensitivity: rash."  Tr. 441.  Jones listed her lupus as stable, continued her hydroxychloroquine, and prescribed a trial of Mobic to replace her naproxen, which was causing heartburn.  Tr. 444-445.  She continued her Amitriptyline and Flexeril for fibromyalgia.  Tr. 445.  She diagnosed low back pain with right lower extremity sciatic pain, prescribed a Medrol pak, placed an order for a spine consult and a lumbar x-ray, and advised Lumpkin do home exercises.  Tr. 445.  An x-ray of her lumbar spine showed mild degenerative changes at L5-S1.  Tr. 452.

On July 30, 2020, Lumpkin saw physician's assistant Alfred Melilo at the Cleveland Clinic Spine Institute for her complaints of right lower back pain radiating down her buttock to her calf.  Tr. 469-470.  She reported a history of lumbar issues for the past 9 years but worse symptoms the past 2-3 months.  Tr. 470.  She stated that she also had numbness and tingling down her right leg and it felt weak at times with prolonged standing/walking.  Tr. 470.  She had tried conservative treatment (Gabapentin and a home exercise program).  Tr. 470.  Upon exam, she was in no distress, she was oriented with a pleasant mood and benign affect, she had a normal gait, full muscle strength, and intact sensation, and a visual inspection of her spine was normal.  Tr. 473.  Melilo assessed lumbar spondylosis and probable L5 right-sided radiculopathy, ordered an MRI, and indicated that he would discuss a trial of Lyrica with her rheumatology team.  Tr. 473.

On September 2, 2020, Lumpkin had a tele-med appointment with Nurse Jones.  Tr. 463.  She reported starting Lyrica two weeks prior but had not noticed any improvement of her back pain yet.  Tr. 463.  She admitted to missing some doses of her hydroxychloroquine.  Tr. 463.  Her insurance company had denied her MRI request because she had to do physical therapy first.  Tr. 463.  She had no joint swelling and reported stiffness throughout the day and pain in her hands, shoulders, low back, and right lower extremity, rated 8-9/10.  Tr. 463, 465.  Upon exam, she was awake and oriented, had a rash on her

left arm, and could make a complete fist with both hands.  Tr. 465.  Her medications were continued.  Tr. 467.[3]

## C.    State Agency Reports

On March 13, 2020, Gary Hinzman, M.D., reviewed Lumpkin's record and found that she had no severe physical impairments.  Tr. 100-101.  On May 21, 2020, James Cacchillo, M.D., agreed with Dr. Hinzman's opinion.  Tr. 109-110.

On February 20, 2020, Karla Delcour, Ph.D., reviewed Lumpkin's record and, regarding her RFC, found that she could perform simple, routine, low stress work, 1-3 step tasks without a rapid pace, and could interact with the public on an occasional and superficial basis.  Tr. 103-105.  On May 21, 2020, Robyn Murry-Hoffman, Psy.D., agreed with Dr. Delcour's opinion.   Tr. 112-113.

## D.    Hearing Testimony

During the September 11, 2020 hearing, Lumpkin testified to the following:

- She lives with her adult son.  Tr. 53-54.  She has a driver's license and is able to drive.  Tr. 54.

- When asked what has changed since her last disability hearing in 2015, she stated that she was diagnosed with spinal stenosis: she has narrowing of her spine and degenerative disc disease.  Tr. 55.  She was just diagnosed a month prior to the hearing via x-ray, but she has always dealt with back pain and had complained to her providers about it but it had never been addressed.  Tr. 55, 56.  An MRI was ordered but she has to do physical therapy before her insurance will cover it.  Tr. 56.  When asked if her other symptoms have changed, she stated that she is becoming more sensitive to the sun and her pain had gotten worse, which she attributed to her back acting up more and causing pain throughout her body.  Tr. 55.  "Just basically pain, fatigue, drowsiness" are the main issues she's having with her body.  Tr. 55.

- When asked how her doctors have treated her spinal stenosis and arthritis, she answered that she was prescribed Lyrica, which she takes once a day.  Tr. 58.  Her first physical therapy appointment had been scheduled for eleven days after the hearing.  Tr. 58.

- When asked to describe a typical day, Lumpkin stated that she attempts to get up; some days she can't because her back and ribs hurt and she might be having a flare-up.  Tr. 58.  When

---

[3] Lumpkin includes a summary of medical evidence she submitted after the ALJ's decision.  Doc. No. 13, p. 7.  She does not ask the Court for a sentence six remand based on that evidence so the Court does not include a summary of it.

she does get up she will "mess around with my plants for a little bit," which she finds therapeutic.  Tr. 58.  She'll try to do as much as she can around the house to tidy up until her body won't let her anymore or she has to take a break.  Tr. 58.  She takes sporadic breaks throughout the day, lying flat on her back to relieve some of the pain she feels.  Tr. 58.  She lies down flat, on the floor or her bed, at least four times a day.  Tr. 65.  She has no plans and can't plan her day because she doesn't know how her body will feel in advance; she just wakes up, messes with her plants, and takes it from there.  Tr. 58.

- In addition to working with plants, she likes to read a lot; she reads magazines and books about plants or history books.  Tr. 59.  She reads until her eyes get tired, so for about 45 minutes to an hour straight and then she takes a break.  Tr. 59.  When asked if she had difficulty concentrating while reading or any difficulties in general reading, she stated that she understands what she is reading.  Tr. 59.  At times she has difficulty holding concentration on stuff with "the fogginess, with the medications I take."  Tr. 59-60.  She takes a lot of them twice a day that cause drowsiness so she tries to get up and do as much as she can until her body tells her no.  Tr. 60.

- When asked if she spent any time with friends, she answered that she doesn't really have too many friends.  Tr. 60.  She has trust issues with people so she finds it best and safer to just stay to herself.  Tr. 60.  She used to enjoy going out dancing and working out, which she used to do quite often, but no longer does because she can't do it anymore; "I really don't know what I can and can't do, which is why it's difficult."  Tr. 60.  Her therapy appointment is necessary so she knows what she can't do.  Tr. 60.  She goes grocery shopping with her son or a friend who helps her.  Tr. 60.

- She does laundry at home; her washer and dryer are on the same level so she doesn't have to go up and down steps, which helps a lot.  Tr. 61.  She can do dishes but can't stand for a long period of time.  Tr. 61.  Her son gets food a lot.  Tr. 61.  Her daughter lives in the same town and helps her when she can, about twice a week.  Tr. 66.  Her big issue is repetition; she can start something but then the repetitive motion affects her.  Tr. 61.  She can stand for about 30 minutes and then her back starts acting up and her calves will start to ache.  Tr. 66.  When asked if walking was limited in any way, she stated that she can walk and that walking helps at times because it's a stretching sort of motion.  Tr. 66-67.  She estimated that she could walk about 30 minutes at a normal pace.  Tr. 67.  Sitting hurts because of sciatica.  Tr. 67.

- When asked whether her lupus had changed in the last couple of years, she stated that it has gotten more sensitive and explained that her tolerance to sun exposure has worsened.  Tr. 61.  Her fingers, hands and wrists are more sensitive to touch.  Tr. 61.  At times it felt like a current was running through her hands: tingling, numbness, sharp shooting pains in her hand joints.  Tr. 61.  She described a feeling sometimes like she wants to scratch her bones.  Tr. 61-62.  Her hands are stiff all the time and it can hurt to grab a doorknob, open a can, or type for a period of time.  Tr. 62.  Her shoulders, knees, feet, elbows, and calves also hurt.  Tr. 62.  It hurts to sleep on her side.  Tr. 62.  All that is a normal day; when she has a flare-up her hands swell and her wrists really hurt.  Tr. 62-63.  She believes that is from the fibromyalgia; she feels like dying with her wrists hurting and she can't move.  Tr. 63.  Also, her back will

swell up at the bottom when she's having a flare-up.  Tr. 63.  She stated that she has lupus flare-ups and fibromyalgia flare-ups.  Tr. 63.  She has fibromyalgia flare ups more consistently and those are in her back and they are debilitating.  Tr. 63.  She has them 4-5 times a week and when she eats certain foods her ribs hurt.  Tr. 63.

- She had been prescribed methotrexate for lupus but is not able to take it now because she thinks it was too strong for her system.  Tr. 63-64.  Her hair is falling out, but it fell out more on that medication.  Tr. 64.  She was getting a nauseous kind of feeling from it.  Tr. 64.  Also, she had to get blood work done every month to take it "so I knew it was too strong."  Tr. 64.  She still took Plaquenil and the dose had been increased to 1.5; it had been increased to 2, but that was too strong so they put her down to 1 and then 1.5.  Tr. 64.

- When asked how she resolves her fatigue, she stated that she takes sleeping pills at night.  Tr. 64.  She takes Flexeril, which makes her loopy.  Tr. 64.  She has to take her sleeping pills or she can't sleep.  Tr. 64.  Her pills keep her drowsy and tired during the day.  Tr. 64-65.  But if she doesn't take her pills she is in a lot of pain.  Tr. 65.  She also uses heat to help her back and her son sometimes massages it for her.  Tr. 66.  "I could sneeze and my back could go out."  Tr. 66.

- When asked if her anxiety limits her ability to work, she answered yes because she knows she is going to be in pain.  Tr. 67-68.  She doesn't like confrontation and doesn't want to be in a situation where a supervisor or someone doesn't believe that she can't do something and she won't be able to fulfill her obligation.  Tr. 68.  She feels nervous and antsy.  Tr. 68.  She gets anxiety just thinking about being with other people, especially when she is in pain, because she gets snippy, irritated, and anxious.  Tr. 68.  She does not take any medication for her anxiety or any other mental condition.  Tr. 68.

The ALJ stated that Lumpkin had no past relevant work and asked the VE whether a hypothetical individual with the same age and education as Lumpkin could perform any work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 69-70.  The VE answered that such an individual could perform the following representative jobs in the economy: information clerk, office helper, and cashier.  Tr. 70.  Lumpkin's attorney asked the VE whether an individual could perform work if she was off task 15-20% of the day or absent twice a month and the VE answered no.  Tr. 72-73.

10

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

11

1.    The claimant has not engaged in substantial gainful activity since December 3, 2019, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: spine disorder (degenerative disc disease of the lumbar spine) and cutaneous lupus (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except frequently handle and finger bilaterally; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; occasionally stoop, and occasionally crawl.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on September **, 1978 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since December 3, 2019, the date the application was filed (20 CFR 416.920(g)).

Tr. 29-41.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less

than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

Lumpkin argues that the ALJ's RFC finding that she could perform light work is not supported by substantial evidence because the ALJ failed to find her psychological impairments and fibromyalgia to be "severe" at step two.  Doc. No. 13, p. 11.

### A. The ALJ did not err when he determined that Lumpkin's mental impairments were not severe

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment or combination of impairments significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).  When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an

14

impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018).  "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (emphasis in original, quoting SSR 96-8p).

Here the ALJ found that Lumpkin had the following severe impairments: spine disorder (degenerative disc disease of the lumbar spine) and cutaneous lupus.  Tr. 29.  The ALJ listed Lumpkin's medically determinable mental impairments—ADHD, depressive disorder, and anxiety disorder—and found that, considered alone and in combination, they did not cause more than a minimal limitation in her ability to perform basic mental work activities and, therefore, were non-severe.  Tr. 30.  He detailed her medical history beginning with her hospitalization for anxiety in 2015 and her prescribed medications at discharge.  Tr. 30.  He stated that she saw her primary care provider in October 2017 to July 2018 with a history of depression, anxiety and insomnia; she complained of depression and fatigue; and exam findings showed occasional anxiety but were normal otherwise (alert, oriented, cooperative, normal mood and affect).  Tr. 30.  Dr. Dahbar diagnosed generalized anxiety disorder, major depressive disorder, and insomnia secondary to depression with anxiety, prescribed melatonin, and referred her to psychiatry, but Lumpkin admitted that she only went to psychiatry a few times and she was not interested in psychotropic medications.  Tr. 30.

The ALJ commented that Lumpkin had a counseling intake appointment in November 2017 at which she complained of life stressors, including a recent eviction, and denied suicidal or homicidal ideation or psychosis.  Tr. 30.  Her mental status exam findings were unremarkable (alert, oriented,

cooperative, appropriate mood and affect, adequate coping skills) and she was diagnosed with bipolar

disorder.  Tr. 30.  The ALJ discussed her consultative exam with Dr. Smith in February 2020 and her

complaints of depression, anxiety, sadness, difficulty interacting with others, moodiness when in pain or

having sleeping difficulties, and difficulty staying on task, and that she admitted that she was high-

strung.  Tr. 30.  She was taking one medication (Elavil) but not another (duloxetine).  Tr. 30.  Her exam

findings showed anxiety (she jiggled her leg repeatedly and had very rapid speech) but her other

findings were unremarkable (alert and oriented, appropriate affect, normal thoughts, direct, pointed

responses/speech, intact attention, concentration, memory, and cognitive function, and fairly good

insight and judgment).  Tr. 30.  Dr. Smith diagnosed ADHD, predominantly hyperactive impulsive

presentation, mild.  Tr. 30.  The ALJ concluded,

> Despite the claimant's history of mental impairment, examinations have revealed only
> occasional, mild mental status abnormalities, even without sustained participation in formal
> mental health treatment (Exhibit B2F, B3F, B6F). Given the limited treatment record, the lack
> of sustained abnormal mental status findings, and the lack of sustained formalized behavioral
> health treatment, such as treatment with a psychiatrist or participation in counseling or
> psychotherapy, the undersigned finds that overall, the claimant's depressive disorder, anxiety
> disorder, and ADHD have no more than a minimal impact on her ability to perform basic work
> related tasks, and are therefore non-severe conditions.

> The mental impairment related opinion evidence of record is not persuasive.

> Consultative examiner Dr. Smith opined the claimant would appear to be capable of
> understanding written or spoken instructions, and may be able to remember them successfully,
> but will occasionally have difficulty carrying them out over a long period of time (Exhibit B3F).
> Dr. Smith opined the claimant may have difficulty maintaining adequate attention and
> concentration and persistence in the performance of simple or more complex tasks through a
> long workday and work [w]eek (*Id*.). He noted the claimant may have some difficulty dealing
> appropriately with groups of coworkers because of her preference to avoid interactions with
> others, but she would probably be capable of dealing appropriately with a supportive supervisor
> (*Id*.). Dr. Smith opined the claimant may have occasional difficulty dealing with interpersonal
> work pressures that might arise in a job situation (*Id*.). This opinion is inadequately supported,
> given Dr. Smith's own examination findings of overt anxiety/nervousness and rapid speech, but
> otherwise normal mental status (*Id*.). In fact, the opinion appears to be based primarily on the
> claimant's subjective reports (*See Id*.). In addition, the opinion is inconsistent with the
> remaining evidence of record, including findings of occasional anxiety, but otherwise normal
> mental status, including normal alertness and orientation, cooperative behavior, no distress, and

16

normal mood and affect, despite a lack of sustained participation in formal mental health treatment (Exhibit B6F/13-38; B2F/4). Thus, Dr. Smith's opinion is not persuasive.

State disability determination services psychological consultants Karla Delcour, Ph.D., and Robyn Murry-Hoffman, Psy.D., opined the claimant can perform simple, routine, low stress, 1-3 step tasks without rapid pace demands, and can interact on an occasional and superficial basis with the public (Exhibit B4A, B6A). These opinions are not persuasive. First, they are inadequately supported by the evidence of anxiety, with repeated jiggling of the leg, and very rapid speech, but otherwise normal mental status findings, including normal appearance and behavior, direct and organized thoughts/responses, appropriate affect, sensorium and cognitive functioning within normal limits, and fairly good insight and judgment on consultative examination cited therein (Exhibit B4A/3; B6A/4). In addition, the opinions are inconsistent with the remaining evidence of record, including findings of occasional anxiety, but otherwise normal mental status, including normal alertness and orientation, cooperative behavior, no distress, and normal mood and affect, despite a lack of sustained participation in formal mental health treatment (Exhibit B6F/13-38; B2F/4). Therefore, I find the opinions of the state disability determinations services psychological consultants unpersuasive.

Tr. 30-31.

Lumpkin disagrees with the ALJ's finding that her mental impairments are not severe.  She argues that the ALJ's own findings undercut his conclusion and cites the ALJ's acknowledgment of her psychiatric hospitalization in 2015.  But that June 2015 hospitalization occurred 4 ½ years prior to her current application date, December 2019.  *See, e.g., Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 478 (6th Cir. 2018) ("Generally, when a social security disability claimant simply fails to present any contemporaneous medical evidence of disability from the relevant time period, the claimant cannot carry their burden of proving their disability for the relevant period.") (cleaned up).  And, as the ALJ commented, although she was discharged in 2015 with prescription medications, she stopped taking those medications, stated that she was not interested in taking medications, and only went to psychiatry a few times despite her doctor providing her with a referral.  Tr. 30.  Lumpkin's lack of treatment is substantial evidence supporting the ALJ's finding that her mental impairments are not severe.  *See, e.g., Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) (failure to seek treatment during relevant period supported the ALJ's finding that the claimant's alleged mental impairment was not a medically

determinable impairment); *Haack v. Comm'r of Soc. Sec.*, 2018 WL 4906606, at *4 (E.D. Mich. Mar. 1, 2018) (ALJ's statement that the claimant failed to seek mental health treatment was evidence to support the ALJ's finding that the claimant's mental health condition was not severe at step two);[4] *Bonar v. Comm'r of Soc. Sec.*, 2021 WL 4260425, at *4 (S.D. Ohio Sept. 20, 2021).[5]

Next, Lumpkin argues that the ALJ "concedes that a physician, Dr. Dahbar diagnosed major depressive disorder, insomnia secondary to depression and generalized anxiety disorder for which Plaintiff was referred to psychiatry" and asserts that other providers diagnosed mental health conditions. Doc. No. 13, pp. 13-14.  But the "mere diagnosis" of an impairment "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863.  Indeed, the ALJ commented that exams showed "only occasional, mild mental status abnormalities, even without sustained participation in formal mental health treatment."  Tr. 30.  Those objective exams support the ALJ's finding that Lumpkin's mental impairments did not cause more than a minimal impact on her ability to perform basic work-related tasks.

Lumpkin contends that the Court should find it "suspect" that the ALJ rejected the mental impairment opinion evidence and states, "The ALJ essentially suggests that because Plaintiff is alert and cooperative, and did not continue in formal mental health treatment, these opinions set forth above are not supported."  Doc. No. 13, p. 14.  But the ALJ did not find that she was just alert and cooperative— she also had appropriate affect; normal thoughts; direct, pointed responses/speech; intact attention, concentration, memory, and cognitive function; and fairly good insight and judgment.  The ALJ wrote that those findings did not support Dr. Smith's opinion, and that Dr. Smith's opinion was inconsistent with other evidence in the record showing occasional anxiety but otherwise normal findings despite the

---

[4] Report and recommendation adopted, 2018 WL 4658995 (E.D. Mich. Sept. 28, 2018).

[5] Report and recommendation adopted, 2021 WL 4942713 (S.D. Ohio Oct. 22, 2021).

fact that she did not participate in mental health treatment.  *See* 20 C.F.R. § 416.920c(b)(2) (supportability and consistency are the two most important factors an ALJ weighs when considering opinion evidence).  The ALJ also stated, with accuracy, that Dr. Smith's opinion was based on Lumpkin's subjective reports.  *See* § 416.920c(c)(1) ("Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.").  The ALJ's reasons for rejecting the state agency reviewers' opinions—because they were based on Dr. Smith's opinion—is also accurate.  *See id*.

Lumpkin submits, "the physicians rendering these opinions are the ones who found noted [sic] Plaintiff is alert, cooperative and were aware that counseling ended, yet still opined Plaintiff was limited as described above."  Doc. No. 13, p. 4.  But that does not preclude the ALJ from citing Lumpkin's lack of treatment when concluding that she did not have limitations caused by her mental impairments and observing that the opinion evidence was inconsistent with the record because her exam findings were mostly normal despite her lack of treatment.  She complains that the ALJ did not rely upon opinion evidence to support his step two finding (Doc. No. 13, pp. 14-15) but cites no legal authority for her assertion that the ALJ must rely upon opinion evidence when finding an impairment not severe at step two.

Finally, Lumpkin asserts that when the ALJ considered the four areas of mental functioning for evaluating mental disorders he found that Lumpkin had mild limitations in all areas: understanding, remembering and applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.  Doc. No. 13, p. 15 (citing Tr. 32).  She states that she has more than "mild" limitations but provides no argument or evidence in support of that statement and does not identify any error she believes the ALJ made.  She submits that, even if she did have mild limitations in

19

all areas, that "still supports a finding that Plaintiff's mental health conditions are severe, when all considered in combination."  Doc. No. 13, p. 15.  But 20 C.F.R. § 416.920a(d)(1) provides, "If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  Here, the ALJ wrote that because Lumpkin had "no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are non-severe (20 CFR 416.920a(d)(1))."  Tr. 32 (emphasis in original).

The Court finds that the ALJ did not err at step two when he found that Lumpkin's mental impairments were not severe.

## B. The ALJ did not err when he determined that Lumpkin's fibromyalgia was not a medically determinable impairment

Lumpkin also challenges the ALJ's step two finding with respect to her fibromyalgia.  At step two, the ALJ wrote,

> The claimant alleges disability in part due to fibromyalgia (Exhibit B3E, B5E). However, the record is absent sufficient objective medical evidence to establish the condition as a medically determinable impairment in accordance with the regulations. Although the record contains diagnoses of fibromyalgia (Exhibit B1F/9, 16; B5F/7; B8F/8; B4F), it is absent sufficient objective medical evidence to establish the condition as a medically determinable impairment as set forth in SSR 12-2p. More specifically, the medical record is absent any references to positive fibromyalgia related tender points on examination (Exhibit B1F, B4F, B5F, B6F, B7F, B8F). In addition, while the record indicates a history of widespread pain in all quadrants of the body with associated, repeated manifestations of fibromyalgia symptoms, there is no evidence of record that other disorders that could cause the symptoms or signs were excluded (*Id.*). In fact, the claimant's alleged fibromyalgia symptoms could easily be attributable to her other medically determinable impairments, including severe systemic lupus erythematosus and spine disorder, and non-severe mental impairments (Exhibit B1F, B2F, B3F, B4F, B5F, B6F, B7F, B8F). Thus, the medical record fails to establish fibromyalgia as a medically determinable impairment in accordance with SSR 12-2p, and therefore fibromyalgia will not be considered when assessing the claimant's residual functional capacity.

Tr. 33.

As an initial matter, Lumpkin's argument that the ALJ erred when he found her fibromyalgia to be not severe (Doc. No. 13, p. 15) misses the mark because the ALJ did not reach the issue of whether her fibromyalgia was severe or not; he found that it was not a medically determinable impairment.  *See* 20 C.F.R. § 416.921 ("If you are not doing substantial gainful activity, we will then determine whether you have a medically determinable physical or mental impairment(s).... After we establish that you have a medically determinable impairment(s), then we determine whether your impairment(s) is severe.").

Lumpkin agrees that the ALJ cited the correct ruling when evaluating her fibromyalgia, SSR 12-2p (Evaluation of Fibromyalgia), but argues that SSR 12-2p describes two ways a claimant can establish fibromyalgia as a medically determinable impairment but the ALJ only considered one of them.  Doc. No. 13, pp. 16-17.  The two ways a claimant can show that fibromyalgia is a medically determinable impairment under SSR 12-2p are: (1) a history of widespread pain that has persisted for at least three months, at least 11 positive tender points on physical examination, which must be found bilaterally and above and below the waist, and evidence that other disorders that could cause the symptoms or signs were excluded; or (2) a history of widespread pain, repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome, and evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  2012 WL 3104869, at *2-3 (July 25, 2012).  Both approaches include a finding that other disorders that could cause the symptoms or signs were excluded, and the ALJ found that the evidence showed that other disorders that could cause the symptoms or signs were not excluded, *i.e.*, the ALJ found that Lumpkin could not satisfy either approach to establish that her fibromyalgia was a medically determinable impairment.

Lumpkin asserts that Dr. Desai found that her symptoms-severity scores were "consistent with

21

fibromyalgia" and submits, "It stands to reason that Dr. Desai, a rheumatologist familiar with [fibromyalgia], ruled out other causes to Plaintiff's chronic pain to render her diagnosis of [fibromyalgia] after thorough examination and evaluation of Plaintiff's medical history."  Doc. No. 13, p. 15.  That argument fails because it is based on an assumption, not evidence.  *See* SSR 12-2p, 2012 WL 3104869, at *3 ("Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia].[]  Therefore, it is common in cases involving [fibromyalgia] to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs.").  Dr. Desai also diagnosed Lumpkin with systemic lupus erythematosus, a disease, the ALJ noted, that could cause her symptoms, and the ALJ cited Lumpkin's severe spine disorder and her non-severe mental impairments as additional conditions that had not been ruled out as the cause of her symptoms.  Lumpkin cites a treatment note from a visit with Dr. Desai in August 2019 in which Dr. Desai's impression was that Lumpkin's joint pains were more consistent with fibromyalgia, Doc. No. 13, p. 15 (citing Tr. 255), but in March 2020 Dr. Desai listed Lumpkin's "persistent joint pain" as a symptom of her lupus, not as a symptom of her fibromyalgia.  Tr. 318.  Lumpkin also cites a treatment note from June 2020 when she saw Nurse Jones, who continued Lumpkin's fibromyalgia diagnosis based on her system-severity score from February 2019 and prescribed a Medrol pak.  Doc. No. 13, p. 15.  But Jones prescribed the Medrol pak for Lumpkin's low back pain with sciatica, not her fibromyalgia.  Tr. 440, 445.  Thus, the evidence Lumpkin cites does not show "examinations and testing that rule out other disorders that could account for [her] symptoms and signs."  SSR 12-2p, 2012 WL 3104869, at *3.  Rather, the evidence supports the ALJ's decision.

The Court finds that the ALJ's conclusion that Lumpkin's fibromyalgia is not a medically determinable impairment is supported by substantial evidence.

22

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**


Date: March 3, 2022                                      *s/ Jonathan Greenberg*
                                                         Jonathan D. Greenberg
                                                         United States Magistrate Judge